(C. D. 1816)

JOSEPH DIXON CRUCIBLE COMPANY *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 25, 1956)

*John D. Rode* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*William J. Vitale*, trial attorney), for the defendant.

Before JOHNSON and DONLON, Judges

JOHNSON, Judge: The merchandise involved herein, described on the invoice as "Schippach Pencil Clay," was imported from Germany on or about November 27, 1951. It was assessed with duty by the collector at $1 per ton under paragraph 207 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, as unwrought ball clay. It is claimed that the merchandise is not ball clay and is properly dutiable at 50 cents per ton under said paragraph 207, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, and the President's notification of September 10, 1951, effective October 1, 1951, T. D. 52820, as unwrought clay, not specially provided for, other than common blue clay or other ball clay.

The pertinent provisions of the tariff act, as modified, are as follows:

PAR. 207 [as modified by the General Agreement on Tariffs and Trade, T. D. 51802]. Clays or earths, including common blue clay and Gross-Almerode glass pot clay, not specially provided for:

Unwrought and unmanufactured_____$1 per ton

PAR. 207 [as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T. D. 52739, and T. D. 52820]. Clays or earths (except common blue clay and other ball clays, but including Gross-Almerode glass pot clay), not specially provided for:

Unwrought and unmanufactured_____50¢ per ton

The issue before the court is whether the imported clay is a ball clay, thus falling within the exception in the modification of paragraph 207 by the Torquay protocol, *supra*. Two witnesses testified at the trial: Robert A. Harris, an employee of the plaintiff company, and Louis Gurian, a chemist in the United States Customs Laboratory in New York.

For the sake of clarity, we note first the following general information brought out on the cross-examination of the witness Gurian. Clay is a natural product found in the earth's surface over almost the entire world. There are at least 50 to 100 types, which vary in qualities and characteristics, depending on the location of the deposits. Plasticity is a quality of practically all kinds of clays, some being more plastic than others. All clays harden to a certain degree after they are baked, but not many of them change color. The most outstanding of those which do change color is ball clay. Before it is baked, ball clay is brown, black, pink, red, or blue in color and turns white, or nearly white, when burned. It is used in pottery making because it can be mixed with kaolin [another type of clay], which is very white. Pottery is not made out of kaolin alone because that type of clay is not sufficiently plastic. Ball clay, because of its very fine bonding power, is added to hold the material together. There is no standard chemical analysis for ball clay.

The witness Harris testified as follows: The business of the plaintiff company is the manufacture of lead pencils, crayons, crucibles, graphite products, industrial paints, and erasers. He has been with the company since 1913 and has been employed as buyer of graphites and clays for 15 or 20 years. His duties include the location of sources of supply of graphites and clays around the world. He is familiar with the merchandise involved herein and produced a sample, which was marked plaintiff's exhibit 1. The sample consists of irregular pieces of a grayish brittle material, having a somewhat slimy feeling.

The witness said he has personally purchased such merchandise for at least 15 years. This particular grade of clay can be purchased only in Germany, where it is obtained from clay mines near the Main River. The merchandise was offered to the witness as Schippach pencil clay, Schippach being the name of the producer or the name of the mine. It was not offered as ball clay. His company never purchased ball clay from Schippach.

Such merchandise is used by the plaintiff company in the manufacture of pencil leads. After being processed, it is mixed with graphite and other materials to make such leads. According to the witness, clay which is used to make pencil leads must be very plastic and sticky and be a very good binder so the other ingredients will blend with it. The experience of his company has been that merchandise, such as plaintiff's exhibit 1, has those qualifications. Such merchandise has not been used by his company for any other purpose.

The witness has been familiar with ball clay for about 15 years and has purchased it for his company from England. Ball clay is used to make refractories, such as crucibles, foundry stirring rods and stoppers, and retorts. A clay different from plaintiff's exhibit 1 is required for these purposes. It must not be so sticky nor as plastic. In the experience of the witness, there is a distinction between ball clay and pencil clay, each having its own qualities and uses. In his opinion, plaintiff's exhibit 1 is a pencil clay and not a ball clay.

The witness stated that his firm never used ball clay for making pencil leads; that, for 15 years, it has been using Schippach clay and, prior to that, the same clay with a different name. It was imported only from Germany. He knew that other pencil manufacturers in the United States also used Schippach clay in the manufacture of pencil leads. In his experience, ball clay was never used in the manufacture of such leads. He had never heard of it being so used and disagreed with statements to that effect, which were read to him from the Encyclopedia of Chemical Technology, by Kirk and Othmer, volume 3, page 102; *Lead and Slate Pencils*, by N. N. Godbole; and *Clay and What We Get From It*, by Alfred B. Searle.

According to the witness, a crucible cannot be made out of Schippach pencil clay, nor can pencil lead be made out of ball clay. He

explained that pencil clay is too plastic to make crucibles, and ball clay is not plastic enough to make pencil lead. While refractory products can be made from almost any ball clay, whether domestic or foreign, clays such as plaintiff's exhibit 1 cannot be so used. His company has tried it in experiments and the products were not the same. The crucibles did not last; they cracked; the drying was not the same.

Defendant's witness, Louis Gurian, testified that he has engaged in the study of industrial chemistry in connection with his work, including the analysis of clays and other related products. With an assistant, he made an analysis of a sample of the involved merchandise, a portion of which was received in evidence as defendant's exhibit A. It is a grayish material, similar to plaintiff's exhibit 1. The witness stated that it came into the laboratory "in the form of a large chunk of reddish clay material" and that its color and appearance suggested to him that it might be ball clay. He broke off a piece and crushed and ground it into a powder. When heated at 1,000° C., the material changed in color to a light cream or buff. He moistened a portion of the powder, and, finding it to be very plastic, made tiny clay balls, which he placed in an oven at 105° overnight. The result was very hard, plastic balls that retained their shape and color. When fired at 1,000° C., the balls became harder and tougher in appearance, resistant to pressure, and the color was changed to a light cream or buff, which, he said, is characteristic of ball clay.

From these tests, the witness was positive that the merchandise was ball clay, because of its plasticity, its hardness after baking, and its change in color. He said that ball clay is distinguished from other clays, in that it burns on firing to a white or light cream or buff color; that it is one of the most plastic clays known. He never heard of pencil clay, but he knew from his reading and studies that clays are used in pencils and they are ball clays. Some of the authorities he relied upon were the Encyclopedia of Chemical Technology; Compressed Air Magazine, New York, 1943, volume 48; *Lead and Slate Pencils*, by N. N. Godbole; *Clay and What We Get From It*, by Alfred B. Searle.

The witness stated that the tests he made were simply laboratory tests. He does not buy or sell ball clay or pencil clay in commercial quantities. He did not try to make either crucibles or pencil leads out of merchandise like plaintiff's exhibit 1.

The question here involves the identity of the imported clay, which was classified by the collector as a type of ball clay. It is evident from the record that the merchandise and ball clay resemble each other, in that both are very plastic, have high bonding power, and become whitish in color after firing. The two are used for different

purposes. Plaintiff's exhibit 1 is used commercially only in the manufacture of pencil leads, whereas ball clay is generally used in making pottery and refractory products. The witnesses disagreed as to whether the latter could be used in the manufacture of pencil leads. Ball clay is imported from England, but clay, such as plaintiff's exhibit 1, is imported only from Germany.

According to the authorities, clays may be classified in various ways, one of which is by the specific uses for which they are adapted. Encyclopedia Americana, volume 7, page 69; Encyclopedia of Chemical Technology, volume 4, page 34; Collier's Encyclopedia, volume 5, page 345. From a commercial standpoint (which is the controlling one in tariff matters), classification by properties and uses is the most important. Ladoo and Myers, *Nonmetallic Minerals*, page 146. A number of grades of clay are named from their suitableness to a particular use. Funk & Wagnalls New Standard Dictionary. However, it has been stated that no classification of clays can be perfect, for the properties of clays may grade by almost imperceptible degrees from those of one class to those of another. Ladoo and Myers, *op. cit.*, page 146.

The precise question before us is whether clay, such as plaintiff's exhibit 1, falls within the term "ball clay," as used in the Torquay protocol, *supra*. Said term is not found in the tariff act, although common blue clay, a type of ball clay, is specifically mentioned. However, ball clay and other clays have been described in publications of the Tariff Commission, prepared for the use of Congress. For instance, in the Summary of Tariff Information, 1921, it is stated (p. 270):

Ball clay is impure china clay. It is usually off-color when green, but burns white in the kilns when used in a mixture with pure kaolin. Pure kaolin, or china clay, is not plastic, and for that reason can not be worked on the jiggers and other pottery machines. Ball clay makes the mass plastic without appreciably affecting the color.

Gross-Almerode, also known in the glass trade as glass-pot clay, is a highly refractory clay much used by glassmakers for the pots in which fine glass is melted. * * * Similar high-grade plastic clays are used by the manufacturers of *pencils*, crucibles, abrasives, and enamel ware. [Italics supplied.]

See, to the same effect, the Summary of Tariff Information, 1920, and a pamphlet on paragraph 76 of the Tariff Act of 1913 in the series of Tariff Information Surveys published in 1921.

In the Summary of Tariff Information, 1929, it is stated (p. 449):

Gross-Almerode clay is a German fire clay known in the glass trade as glass-pot clay. * * * Similar high-grade plastic clays are used by the manufacturers of crucibles, abrasives, *pencils*, and enamel ware.

Ball clay is a white or nearly white burning plastic clay of high bonding power. It is used extensively as an ingredient in high-grade tile and pottery to give the body sufficient strength and plasticity. [Italics supplied.]

In the Digest of Trade Data, published in connection with the trade agreement with the United Kingdom, in volume III, page 2–16, it is stated:

Ball clay, which has a white or nearly white color when burned, is a plastic clay of high bonding power. It is used principally in the manufacture of pottery, including tableware and sanitary ware, and to a lesser extent for high-grade tile, terra cotta, oilcloth and linoleum, and other products. * * *

\*    \*    \*    \*    \*    \*    \*

A number of the more important miscellaneous specialized clays are enamel clays, pipe clays, emery-wheel clays, graphite crucible clays and *pencil* clays. * * * [Italics supplied.]

Again, at page 2–20, it was stated that ball clay was "by far the most important type entered under the classification for clays or earths, n. s. p. f., unwrought," but that "many other types of clays, such as * * * pencil clays, * * * crucible clays, and other clays of a specialized nature, are each imported in relatively small quantities" under this classification.

In the Summaries of Tariff Information, 1948, volume 2, part 1, page 85, it is stated:

In 1937–39, imports of ball clay (including common blue clay, a type of ball clay) accounted for 74 percent of the total imports in quantity, and for 67 per cent of the total value; in recent years the corresponding proportions have been greater. The United Kingdom has been by far the chief foreign supplier of ball clay. In addition to ball clay and negligible amounts of Gross-Almerode clay (a German glass-pot clay), many other types are entered under the classification clays and earths, n. s. p. f.; they include special bond clays, pipe clays, enamel clays, *pencil clays,* crucible clays, and others. Many of these clays are particularly suitable for certain uses and sell largely on the basis of quality. Before World War II, Germany was the chief supplier of these special clays; in 1947 shipments from that source were resumed, *the imports consisting largely of a very high-grade and expensive pencil clay* (see unit value, table 4). * * * [Italics supplied.]

It is clear from these publications that, for customs purposes, ball clay and specialized clays, including pencil clays, have been regarded as distinct articles of commerce, both from the standpoint of use and from the standpoint of origin. These publications were all issued prior to the date of the Torquay protocol, *supra.* It may be presumed, therefore, that the essential information contained therein was known to the negotiators of that agreement. The President's proclamation relating to the protocol states specifically in the fourth recital that information and advice were sought and obtained from the United States Tariff Commission, among others. Under these circumstances, the court may properly consider the material in these publications in order to give effect to the intent of the negotiators. *United States* v. *Good Neighbor Imports, Inc.,* 33 C. C. P. A. (Customs) 91, C. A. D. 321; *United States* v. *Weigert-Dagen et al.,* 39 C. C.

P. A. (Customs) 58, C. A. D. 464; *Morganite, Inc.* v. *United States,* 42 C. C. P. A. (Customs) 207, C. A. D. 595.

The weight of the evidence herein and the information in the above publications indicate that there is a distinction commercially and for tariff purposes between ball clay and clay, such as plaintiff's exhibit 1. We conclude that, in using the term "ball clay," the negotiators of the Torquay protocol had in mind the type of clay used in pottery and tilemaking and imported chiefly from England. They did not intend to include therein clay, such as plaintiff's exhibit 1, which is bought and sold as pencil clay, is used exclusively in making pencil leads, and is imported only from Germany.

We hold, therefore, that the merchandise involved herein is properly dutiable at 50 cents per ton under paragraph 207 of the Tariff Act of 1930, as modified by the Torquay protocol, *supra,* as unwrought clay, not specially provided for, other than common blue clay or other ball clay.

The protest is sustained and judgment will be rendered for the plaintiff.